Michael S. Taaffe, FL Bar No. 490318 (Pending *Pro Hac Vice* Admission)
Justin P. Senior, FL Bar No. 1004223 (Pending *Pro Hac Vice* Admission)
James E. Fanto, FL Bar No. 1004144 (Pending *Pro Hac Vice* Admission)
SHUMAKER, LOOP & KENDRICK, LLP
240 South Pineapple Avenue, Post Office Box 49948
Sarasota, Florida 34230-6948
(941) 364-2720; FAX: (941) 366-3999
Mtaaffe@shumaker.com
jsenior@shumaker.com
jfanto@shumaker.com

Greg A. Garbacz, Bar No. 167007
Daniel S. Agle, Bar No. 251090
Irean Z. Swan, Bar No. 313175
KLINEDINST PC
501 West Broadway, Suite 1100
San Diego, California 92101
(619) 400-8000/FAX (619) 238-8707

Attorneys for Plaintiff
AMERIPRISE FINANCIAL SERVICES, LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERIPRISE FINANCIAL SERVICES, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>LPL FINANCIAL, LLC,<br><br>    Defendant. | Case No. **'24 CV 1333 JO   MSB**<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF BY AMERIPRISE FINANCIAL SERVICES, LLC** |

Plaintiff Ameriprise Financial Services, LLC (hereinafter "Ameriprise" or "Plaintiff"), brings this complaint seeking injunctive relief to preserve the *status quo ante* pending arbitration against LPL Financial LLC (hereinafter "Defendant" or "LPL").

/ / /

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

# I.     NATURE OF THE ACTION

1.     Defendant LPL is engaged in the widespread pattern and practice of harvesting and misappropriating Ameriprise's private, confidential client information and trade secrets ("Ameriprise Confidential Information") in connection with its unfair competition within the financial industry. Specifically, Defendant LPL utilizes its financial advisor recruits from Ameriprise to collect, retain, and provide to LPL Ameriprise Confidential Information for LPL's pecuniary benefit. By doing so, Defendant LPL violates: (i) the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*) ("DTSA"); (ii) rules and regulations promulgated by the Securities and Exchange Commission ("SEC") and Financial Industry Regulatory Authority ("FINRA"); and (iii) an industry agreement known as "the Protocol for Broker Recruiting" (the "Protocol"), among other federal and state Laws and industry rules and regulations. Defendant LPL's conduct abandons all reasonable notions of client privacy rights and subjects the advisors it recruits to regulatory, and in some cases even criminal, exposure.

2.     Ameriprise, therefore, seeks a preliminary injunction to enjoin Defendant LPL from retaining, using, disclosing, or transmitting for any purpose, including the solicitation or conducting of business with current, former, or prospective Ameriprise clients ("Ameriprise clients"), such information contained in the records of Ameriprise, or other information pertaining to Ameriprise clients that it improperly obtained, including, but not limited to, the sensitive and protectable personal data and financial information of the clients and, further, to prevent Defendant LPL from destroying, erasing or otherwise making unavailable for further proceedings in this matter any such documents and/or data.[1] LPL's continued

---

[1] Ameriprise and Defendant LPL are both FINRA "Members" and, therefore, are bound to arbitrate Ameriprise's claim for damages and permanent injunctive relief regarding LPL's misconduct before FINRA Dispute Resolution. However, FINRA Rule 13804 expressly permits Ameriprise to seek temporary injunctive relief from

retention, use, and disclosure of the Ameriprise Confidential Information violates the DTSA, the Protocol, and various rules and regulations enacted by the SEC and FINRA.

## II.    <u>THE PARTIES</u>

3.    Plaintiff Ameriprise is a national broker dealer, a leader in the financial planning and wealth management industry, and FINRA member. Ameriprise is registered with the SEC, all fifty states, and Puerto Rico.

4.    Defendant LPL is the country's largest independent broker dealer. Defendant is registered with the SEC, FINRA, all fifty states, and Puerto Rico. Defendant affiliates with more than 21,000 financial advisors nationwide.

5.    Ameriprise is a limited liability company,[2] and as such its citizenship is determined by the citizenship of its members. Ameriprise is organized under the laws of Delaware and headquartered in Minneapolis, Minnesota. Ameriprise is licensed to do business in California.

6.    Ameriprise's sole member is AMPF Holding Corporation, a corporation organized under the laws of Michigan and whose principal place of business is Minnesota. For the purposes of Diversity Jurisdiction, Ameriprise is a citizen of Michigan and Minnesota.

7.    Defendant LPL is a South Carolina limited liability company formed in California. LPL's sole member, LPL Holdings, Inc., is a Massachusetts citizen because it is a Massachusetts corporation with its principal place of business in Massachusetts. Therefore, for the purposes of Diversity Jurisdiction, LPL is a citizen of Massachusetts. Importantly, LPL itself is headquartered at 4707 Executive Drive,

---

this Court to preserve the *status quo ante* in advance of the impending arbitration matter. In accordance with FINRA Rule 13804, Ameriprise simultaneously filed a Statement of Claim in FINRA, attached as **Exhibit A**. Ameriprise is filing a Motion for Preliminary Injunction and is seeking expedited discovery in support of its motion.

[2] Ameriprise was formerly known as Ameriprise Financial Services, Inc.

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

San Diego, California 92121, and is therefore also a citizen of California.

### III.    JURISDICTION AND VENUE

8.      This Court has Diversity Jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are diverse and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs. LPL's misconduct threatens the unauthorized disclosure of confidential information belonging to Ameriprise customers, who have rights to confidentiality under applicable laws and regulations.

9.      The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Ameriprise raises a Federal Question under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq*. ("DTSA").

10.     The Court has supplemental jurisdiction over Ameriprise's other claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and (3) and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and LPL is subject to the court's personal jurisdiction with respect to this action.

### IV.    STATEMENT OF OPERATIVE FACTS

#### a.     Applicable Industry Rules and Regulations

12.     Ameriprise and LPL both operate in an industry that is heavily regulated by the SEC, FINRA, and state and insurance regulators. Like all financial services firms, Ameriprise and LPL are subject to myriad state and federal securities laws and regulations.

13.     In the financial services industry, the protection of client information is heavily regulated.

14.     For example, the Gramm-Leach-Bliley Act ("GLBA") governs the treatment of nonpublic personal information about consumers by financial

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

institutions.[3] The GLBA prohibits a financial institution from disclosing nonpublic personal information about a consumer to nonaffiliated third parties, unless (i) the institution satisfies various notice and opt-out requirements, and (ii) the consumer has not elected to opt out of the disclosure. *Id.* Additionally, it mandates that financial service firms provide notice of its privacy policies and practices to its customers. *Id.*

15.     Further, 17 C.F.R. § 248.1 *et seq.*—also known as the SEC's "Regulation S-P"—mandates that broker-dealers:

> [M]ust adopt written policies and procedures that address administrative, technical, and physical safeguards for the protection of customer records and information. These written policies and procedures must be reasonably designed to: (1) Insure the security and confidentiality of customer records and information; (2) Protect against any anticipated threats or hazards to the security or integrity of customer records and information; and (3) Protect against unauthorized access to or use of customer records or information that could result in substantial harm or inconvenience to any customer.

17 C.F.R. § 248.30.

16.     The SEC takes the position that once a registered representative terminates his or her affiliation with a firm, the representative's use of customer information for any purpose without the customer's express prior consent is a violation of Regulation S-P, which may subject the representative to disciplinary action. See, e.g., U.S. Securities And Exchange Commission, SEC Charges Brokerage Executives With Failing to Protect Confidential Customer Information

---

[3] *See* FDIC Consumer Compliance Examination Manual, *Section VIII-1.1 (Gramm-Leach-Bliley Act (Privacy of Consumer Financial Information))*, (Apr. 2021), https://www.fdic.gov/resources/supervision-and-examinations/consumer-compliance-examination-manual/documents/8/viii-1-1.pdf.

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

(April 7, 2011), https://www.sec.gov/news/press/2011/2011-86.htm; Office Of Compliance Inspections And Examinations, Investment Adviser and Broker-Dealer Compliance Issues Related to Regulation SP – Privacy Notices and Safeguard Policies (April 16, 2019), https://www.sec.gov/files/OCIE%20Risk%20Alert%20-%20Regulation%20S-P.pdf.[4]

17.     Moreover, businesses like LPL must abide by relevant state laws relating to the safeguarding of client data. For example, the California Privacy Rights Act ("CPRA") recently clarified and expanded the California Consumer Privacy Act ("CCPA") which now provides the rights of consumers to "opt-out" of the sharing of their personal information to a third party, like LPL in this case, without their consent. These laws, and similar laws in other states in which LPL does business, create and impose additional requirements related to data retention, data minimization, and purpose limitation, all for the intended goal of protecting consumers' information from being disclosed to third parties. This is a goal that LPL clearly ignores.

18.     Ameriprise takes its obligations under Regulation S-P, GLBA, other industry rules and regulations, and related state and federal client privacy laws seriously, putting in place a variety of safeguards to protect client privacy and security. Ameriprise expects its financial advisors to comply with these requirements and includes strong privacy commitments in its agreements with financial advisors; the facts suggest that LPL does not share Ameriprise's commitment to safeguarding confidential client information.

_____

[4] *See also In re Next Financial Group*, 2008 WL 2440339 (June 18, 2008) (sanctioning firm on allegations it "willfully violated Regulation S-P, 17 C.F.R. Part 248, by disclosing nonpublic personal information about its customers to nonaffiliated third parties without notice or a reasonable opportunity to opt out of such disclosure, by allowing registered representatives to disseminate customer nonpublic personal information to other brokerage firms when leaving NEXT, and by failing to safeguard customer records and information.").

**b.**     <u>**Ameriprise's Confidential Information and Trade Secrets**</u>

19.     Ameriprise invests substantial time, money, and goodwill, to acquire, develop, maintain, and protect its clients. For example, Ameriprise spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information.

20.     Beyond the applicable laws, rules, and regulations, the component of trust is highly important to the relationship between a financial firm and its clients.

21.     Ameriprise employs reasonable efforts to maintain its confidential and proprietary information, including, but not limited to, its client records and information.

22.     To protect its confidential information, trade secrets, and client relationships, Ameriprise: (i) restricts access to those persons and/or affiliates whose affiliations with Ameriprise require them to refer to the confidential information; (ii) requires authorized persons to use a secure password to access their computer terminals and the firm's intranet; (iii) provides constant reminders about the confidential nature of the information contained in the records and the need to protect it; (iv) routinely ensures employees and other authorized persons are made aware of, and know, that they must maintain the strict confidentiality of client information; (v) maintains a detailed privacy policy; and (vi) includes robust confidentiality provisions and appropriate restrictive covenants in its agreements with financial advisors, among other protective measures.

23.     In sum, Ameriprise employs a comprehensive framework to protect client privacy and Ameriprise's Confidential Information and to comply with state and federal securities rules and regulations.

**c.**     <u>**The Protocol for Broker Recruiting**</u>

24.     The Protocol for Broker Recruiting (again, the "Protocol") is a litigation forbearance agreement specific to the financial industry which governs the

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

1  conduct of an advisor transitioning between two Protocol-signatory firms.[5] A copy

2  of the Protocol is attached as **Exhibit B**.[6]

3      25.    Both Ameriprise and Defendant LPL are signatories to the Protocol.

4      26.    The Protocol permits an advisor to take <u>only</u> a list of the clients for

5  whom they are the registered representative of record along with limited contact

6  information <u>as long as this is the only information they take</u> (often called the

7  "Protocol List"). The Protocol expressly prohibits advisors "from taking any other

8  documents or information." **Exhibit B**.

9      27.    However, when a transitioning advisor fails to comply with the

10  requirements of the Protocol, the advisor can no longer claim the protections of the

11  Protocol and the terms of the contractual agreements between the advisor and their

12  former firm apply. *See* **Exhibit B**. Therefore, the violations of the Protocol render

13  the taking and retention of the relevant client information a misappropriation.

14      28.    Similarly, once an advisor joining LPL has violated the Protocol, LPL

15  cannot claim its protections either.

16      29.    To comport with the strictures of the Protocol, an advisor resigning

17  from a Protocol firm may bring to his or her new Protocol firm only the following

18  information: client name, address, phone number, email address, and account title.

19      30.    LPL encourages the advisors it recruits from Ameriprise, and from

---

[5] *See J.P. Morgan Sec. LLC v. Shields*, No. 118CV02788SEBMJD, 2018 WL 11456636, at *6 (S.D. Ind. Dec. 10, 2018) ("The Protocol absolves brokers who move from one signatory firm to another from liability for appropriation of certain former client information and former client solicitation, subject to the broker's compliance with the Protocol."); *Credit Suisse Sec. (USA) LLC v. Lee*, No. 11 CIV. 08566 RJH, 2011 WL 6153108, at *3 (S.D.N.Y. Dec. 9, 2011) ("[T]he Protocol for Broker Recruiting (the "Protocol"), which sets forth certain rules and privileges in situations, like this one, involving brokers (otherwise known as Registered Representatives, or "RRs") who move from one firm to another.").

[6] The SEC has not indicated that the Protocol creates any issues relating to regulatory statutes.

other companies as well across the financial industry, to violate the terms of the Protocol in order to rapidly and unfairly transition business from Ameriprise to LPL. This results in LPL obtaining and using the confidential information of the Ameriprise Clients, many of whom never end up doing business with LPL.

### d. Defendant LPL's Continuous and Ongoing Improper Conduct

31. LPL knows, or reasonably should know, that Ameriprise includes robust confidentiality provisions and restrictive covenants in its agreements with financial advisors to protect Ameriprise confidential information and client privacy.

32. Similarly, LPL knows, or reasonably should know, of the laws and regulations governing treatment of confidential information in the financial industry and beyond.

33. Nevertheless, LPL encourages and advises registered representatives affiliated and/or employed by Ameriprise to violate those provisions in their agreements as well as the statutes and industry rules and regulations described above by retaining Ameriprise Confidential Information well beyond what is permissible pursuant to the Protocol when transitioning to LPL and to then utilize that Ameriprise Confidential Information to solicit Ameriprise clients in further violation of the recruits' contractual obligations to Ameriprise.

34. LPL encourages and instructs Ameriprise recruits to harvest confidential client information from Ameriprise's systems to turn over to LPL shortly after affiliating with LPL, and in the past has provided recruits with the tools and instructions to do so. One such tool is a "bulk upload spreadsheet," which LPL has encouraged Ameriprise recruits to fill with information that they are not otherwise allowed to retain, and bring that information to LPL for LPL's benefit.

35. Previously, LPL has indicated that it stopped this process; however, Ameriprise recently uncovered that LPL is presently engaged in a similar scheme to subvert the Protocol.

36. LPL specifically has requested that the recruited advisors make bulk

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

1  uploads of spreadsheets and has provided instructions related to mining and
2  gathering that information from Ameriprise's systems to be used by LPL to
3  prepopulate forms and open accounts.

4      37.    The language of the Protocol is clear: client name, address, phone
5  number, email address, and account title are the only types of information an advisor
6  may bring from one Protocol firm to another.

7      38.    However, Ameriprise has discovered that LPL has instructed recruits to
8  bring—and those recruits have indeed brought to LPL—the following categories of
9  trade secret information, both for clients they service and individuals they never
10 serviced but only learned about through their affiliation with Ameriprise: contact
11 information, social security numbers, account numbers, account information, routing
12 numbers, client dates of birth, client ID numbers, account values, securities values,
13 funds available, Money Market balance, Margin Available, Product Class, Plan ID,
14 and positions held.

15     39.    This far exceeds the limited types and nature of information that LPL
16 has agreed—by becoming a signatory to the Protocol—that advisors can bring with
17 them from another Protocol firm.

18     40.    Moreover, LPL encourages recruits to provide LPL the harvested
19 Ameriprise Confidential Information immediately upon affiliation with LPL and in
20 at least one case even engaged in a workaround to allow this to happen before the
21 advisor's license transferred to LPL. Within short order following the recruits'
22 respective transitions to LPL, LPL would upload the improperly obtained
23 Ameriprise Confidential Information to LPL's systems. In some cases, recruited
24 advisors took and placed this sensitive information on unsecure and unsupervised
25 networks.

26     41.    Upon information and belief, this is the case for many former
27 Ameriprise advisors who have moved to LPL, as well as countless advisors LPL
28 recruits from other companies in the industry. LPL's disregard of applicable rules

and protocols continues to this day.

42. LPL utilizes the Ameriprise Confidential Information to streamline its solicitation and transfer of Ameriprise clients.

43. LPL and its recruits do not obtain, and in many cases do not even attempt to obtain, consent from Ameriprise or the clients to retain the Ameriprise Confidential Information.

44. Similarly, LPL makes no effort to verify whether recruits provide clients the opportunity to opt out or consent to sharing their private and confidential data with LPL.

45. Upon information and belief, LPL still retains misappropriated Ameriprise Confidential Information for Ameriprise clients who never even transitioned to LPL.

46. In furtherance of its scheme, LPL also falsely misrepresents to its recruits that, on average, it facilitates the transfer of over 90% of the assets any given advisor services in that same time frame. Essentially, LPL uses incorrect and inflated statistical information to entreat advisors to misappropriate confidential client information on behalf of LPL in furtherance of moving the business they service to LPL, for LPL's benefit.

47. In 2024 alone, year-to-date, LPL has added nearly 800 registered representatives industry-wide, a small percentage of which have come from Ameriprise. However, a large percentage of those registered representatives who have left Ameriprise to go to LPL have engaged in similar misconduct. Recently, Ameriprise has uncovered a pattern of continued misappropriation by LPL and the majority of these LPL recruits—LPL encourages the individual representatives to abscond with substantial client documents and confidential client information well beyond that permitted under the Protocol and bring those same documents and the information they contain to LPL, so LPL can benefit from the assets that transfer.

48. In February of this year, LPL had an advisor abscond with detailed,

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

Case No. _____

confidential client information for clients recently assigned to them pursuant to a
"Sunset Agreement" (a standard term for a retirement agreement in the industry by
which a new advisor services clients belonging to a retiring advisor). Information
relating to such clients is *expressly* excluded by the Protocol. LPL and the advisor
utilized the misappropriated confidential information to solicit the clients.

49.     In another example from February of this year, LPL had a different
advisor abscond with detailed, confidential client information for their *teammates'*
(who remained at Ameriprise) clients. Again, LPL and the advisor utilized the
misappropriated confidential information to solicit the clients.

50.     In April of this year, LPL had a team of advisors take bankers boxes
full of confidential documents off of the Ameriprise premises immediately prior to
their transition which they utilized to solicit clients prior to even resigning from
Ameriprise to get a jump-start on their transition to LPL. One Ameriprise Client
even complained they had received a plain, unmarked envelope filled with detailed,
unredacted, highly confidential personally identifiable information such as social
security numbers from the McCanns. Ameriprise brought an action in the Eastern
District of Michigan to enjoin the former advisors as well as LPL. *See Ameriprise
Fin. Servs. v. McCann, et al.*, Case No. 2:24-cv-11471-BRM-KGA, (E.D. Mich.
June 4, 2024) ("*McCann*"). Of course, the federal court in that case enjoined the
advisors and LPL. See *id.*, ECF No. 22 (Order Granting Motion for TRO).

51.     In May of this year, LPL had an advisor send detailed, confidential
client information to an unregistered third-party prior to the advisor's departure
from Ameriprise (including client name, address, phone numbers, email addresses,
account record type (i.e. client or prospect), account number, account names,
account type, funds available, cash balances, money market account balances,
margin balances, product class, representative codes, and plan identification codes)
for *hundreds* of Ameriprise Clients. That third-party is now affiliated with LPL.
LPL and the advisor utilized the misappropriated confidential information to solicit

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

1  the clients.

2      52.    Intentional mass misappropriation is LPL's pattern and practice across

3  the country. It must be enjoined.

4      53.    LPL's misconduct is not limited to Ameriprise Recruits. Just like the

5  above examples—and likely countless other matters—an advisor LPL recruited

6  improperly retained and transmitted confidential information in Florida in 2022. The

7  advisor faced criminal charges along with regulatory sanctions for conduct nearly

8  identical to the conduct described above with respect to Ameriprise Recruits.

9  Allegedly, prior to his departure from his former company, that advisor emailed a

10 spreadsheet containing the names, addresses, social security numbers, and birthdates

11 of customers, including ones that he did not serve, to his wife and then to a contact

12 he expected to work with at LPL.[7]

13     54.    FINRA has sanctioned firms that cause or encourage violations of

14 Regulation S-P when they recruit competitor's advisors to join their firm. Other

15 examples include FINRA's fine of Kestra Investment Services LLC ("Kestra") in

16 2020 when it found that Kestra provided its recruits with customized spreadsheets

17 with particular data fields for the brokers to fill in before they transferred to Kestra.

18 The Letter Of Acceptance, Waiver And Consent ("AWC") states that Kestra

19 employees specifically assisted many of the brokers in completing these

20 spreadsheets with personal customer data before the brokers were hired by Kestra.

21 *See* attached as **Exhibit C.** Ameriprise makes the same allegation as LPL here.

22 _____

23 [7] *See* Karmen Alexander, *Ex-Broker Drew Finra Sanctions, Felony Charges for*

24 *Taking Client Info in Move to LPL*, Advisorhub.com (June 20, 2024), available at
   https://www.advisorhub.com/ex-broker-drew-finra-sanctions-felony-charges-for-

25 taking-client-info-in-move-to-

26 lpl/?utm_medium=email&utm_campaign=NL%206AM%20620&utm_content=N
   L%206AM%20620+CID_bcd685b182f791da08c2b8d918e22353&utm_source=Ca

27 mpaignMonitor&utm_term=Ex-
   Broker%20Drew%20Finra%20Sanctions%20Felony%20Charges%20for%20Takin

28 g%20Client%20Info%20in%20Move%20to%20LPL.

55.    As stated above, this is an industry-wide unfair scheme by LPL. By way of another example, Morgan Stanley brought an action against a former employee who affiliated with LPL for similar egregious violations related to misappropriation of trade secrets. *See Morgan Stanley Smith Barney LLC v. Lonnie Friedman*, Case No. 1:23-cv-00413-JPW (M.D. P.A. Mar. 9, 2023). In that case, Morgan Stanley submitted sworn testimony to the court that the recruit had bragged about taking screenshots of client information to be used in connection with his move to LPL. *See id.*, ECF No. 4-3, at para 4, attached as **Exhibit D**. The affidavit also states that customers in that case reported receiving account-opening documents with LPL account numbers for them even though they had not yet opened accounts at LPL. *See id.* at para 6. The obvious conclusion is that LPL obtained information it was not allowed to have from its recruit, and at its direction.

56.    The above examples of the advisors who faced felony charges and who left Morgan Stanley are purely illustrative; Ameriprise only seeks to redress misconduct that it has suffered—and continues to suffer—at the hands of LPL.

57.    In addition, if granted, Expedited Discovery will reveal that LPL provides encouragement, inducement, and/or instructions to recruits to take Ameriprise Confidential Information, including client confidential information, and bring it to LPL when the Ameriprise advisor affiliates with LPL.

58.    In so doing, LPL encourages Ameriprise advisors to improperly take and retain confidential client information, in violation of their contractual obligations to Ameriprise as well as state and federal laws and SEC and FINRA Rules, and then to use that information to contact clients and solicit them to move their accounts to LPL, in further violation of their agreements.

59.    Discovery will also reveal that, in some cases, the LPL recruits provide the Ameriprise Confidential Information to LPL prior to their affiliation with LPL.

60.    Through its scheme, LPL has stolen and continued to steal extensive confidential documents, confidential information, and trade secrets regarding

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

Ameriprise Clients, including, for example: contact information, social security numbers, account numbers, account information, routing numbers, client dates of birth, client ID numbers, account values, securities values, funds available, Money Market balance, Margin Available, Product Class, Plan ID, and positions held.

61.    LPL is aware that this confidential information holds enormous economic value; indeed, LPL capitalizes on such economic value and receives a substantial windfall attributable to the theft of Ameriprise Confidential Information.

62.    By misappropriating the Ameriprise Confidential Information without the clients' and Ameriprise's consent, LPL continues to flagrantly violate the DTSA, engage in unfair competition, tortiously interfere with Ameriprise's business relations, and falsely advertise their fraudulent successes in order to attract more advisors and perpetuate their scheme, all the while placing those very same advisors at risk along with the confidential and trade secret client information.

## CAUSES OF ACTION

## COUNT I

## APPLICATION FOR INJUNCTIVE RELIEF

63.    The allegations of Paragraphs 1 through 60 are incorporated by reference herein with the same force and effect as if set forth in full below.

64.    By virtue of the foregoing, Ameriprise has demonstrated a sufficient likelihood of success on the merits, and that a balancing of the equities favors the issuance of an injunction against LPL.

65.    Unless LPL is enjoined from retaining and using Ameriprise's confidential and trade secret information, Ameriprise  will continue to be irreparably harmed by: (a) disclosure and misuse of trade secrets, client lists, and/or other confidential information that are solely the property of Ameriprise  and its clients; (b) loss of confidentiality of the information contained in clients' records, loss of confidentiality of clients' financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; (c) damage to office stability, and a

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

1    threat to the enforcement of reasonable contracts; and (d) present economic loss,

2    which is unascertainable at this time, and future economic loss, which is presently

3    incalculable.

4         66.    Ameriprise otherwise has no adequate remedies at law. During the

5    pendency of the underlying FINRA arbitration, which will take well over a year to

6    resolve, and in the absence of injunctive relief, LPL and its registered

7    representatives will still be in possession of Ameriprise client information and will

8    continue to use and disclose it. Monetary damages are not sufficient to address this

9    continuing irreparable harm, and therefore an injunction is necessary to provide a

10   more complete solution.

11        67.    Accordingly, Ameriprise seeks injunctive relief requiring LPL to (1)

12   identify (a) all information obtained by LPL from an Ameriprise recruit relating to

13   an individual that did not become a client of LPL, (b) all Ameriprise recruits with

14   whom LPL discussed the collection and retention of client information not

15   contemplated by the Protocol, and (c) any personal devices used by those recruits to

16   store or transfer such information; and (2) to return all such information to

17   Ameriprise and have it permanently deleted from LPL's systems and the electronic

18   devices identified in 1(b) above.

19                              **<u>COUNT II</u>**

20            **<u>BREACH OF CONTRACT – PROTOCOL FOR BROKER</u>**

21                            **<u>RECRUITING</u>**

22        68.    The allegations of Paragraphs 1 through 60 are incorporated by

23   reference herein with the same force and effect as if set forth in full below.

24        69.    The Protocol is a forbearance agreement to which both Ameriprise and

25   LPL are signatories, and therefore parties to and beneficiaries of the agreement.

26        70.    Accordingly, the Protocol constitutes an existing and valid contract.

27        71.    The Protocol is an agreement among more than 2,000 firms in the

28   financial industry. One of the chief stated goals of the Protocol is "to further the

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ('RRs') between firms." *See* **Exhibit B**.

72.    LPL is benefitting from their participation in the Protocol, but abusing and violating the agreement to generate an unfair advantage over other Protocol-signatory firms that follow the rules.

73.    Ameriprise performs as required under that contract—LPL does not.

74.    LPL does not perform as required under the Protocol by taking categories of information beyond the permissible bounds.

75.    LPL's deviation from the Protocol is not excused.

76.    LPL's breach of the Protocol continues to harm Ameriprise and is a substantial factor in causing Ameriprise's harm

77.    LPL's misconduct constitutes continued breaches of contract.

78.    LPL's breaches of the Protocol result in damages to Ameriprise.

## COUNT III

## MISAPPROPRIATION OF TRADE SECRETS

79.    The allegations of Paragraphs 1 through 60 are incorporated by reference herein with the same force and effect as if set forth in full below.

80.    The above-alleged facts constitute actual and threatened misappropriation of trade secrets by LPL under the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*).

81.    Ameriprise's trade secret client information is financial, business, and economic, Ameriprise takes reasonable steps to protect it, and it derives value from its secrecy as it is not generally known by third parties, and is not readily ascertainable by proper means by third parties.

82.    Ameriprise derives significant economic and competitive advantage in the financial services industry from maintaining the secrecy and confidentiality of its trade secret client information.

83.    Ameriprise's trade secret client information, including the names,

contact information, dates of birth, social security numbers, employment information, advisory fees, account information, annual income, net worth, liquid net worth, approximate account value, expected account value, investment objectives, employer name and contact information, source of client wealth and income, tax bracket, investment time horizon, liquidity needs, investment experience, and beneficiary information, and other information relating or belonging to Ameriprise's clients, is subject to reasonable efforts by Ameriprise to maintain its secrecy, and Ameriprise's employees and affiliates are required to maintain the secrecy and/or confidentiality of that information.

84.     In addition, the names, addresses and contact information of Ameriprise clients are protected from disclosure as personally identifiable information under the Gramm-Leach-Bliley Act and its implementing federal regulations, commonly referred to as Regulation S-P. *See* 17 C.F.R. § 248. Even the fact that an individual is a client of a specific financial institution – here Ameriprise – is protected from disclosure under Regulation S-P. 17 C.F.R. § 248.3. These federal regulations underscore the highly confidential nature of financial services client information.

85.     LPL has improperly and without authorization misappropriated, retained, used, and disclosed Ameriprise's trade secrets, including Ameriprise's confidential client information. Upon information and belief, it has done so for the purposes of transferring the accounts of clients from Ameriprise to LPL.

86.     LPL's continued retention, use, and disclosure of Ameriprise's trade secret client information, as alleged herein, constitutes actual and threatened misappropriation of trade secrets pursuant to the DTSA and is willful and malicious.

87.     Because LPL's unlawful conduct is ongoing, Ameriprise faces an immediate threat of continuing irreparable harm, for which Ameriprise lacks any adequate remedies at law.

88.     The DTSA permits a court to enjoin "any actual or threatened

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

1  misappropriation."18 U.S.C. § 1836(b)(3)(A)(i).

2      89.    Unless LPL is enjoined from the foregoing conduct, Ameriprise will be

3  irreparably harmed by: (a) disclosure of Ameriprise's trade secret client information,

4  and other confidential account information that is solely the property of Ameriprise;

5  (b) loss of goodwill; and (c) present economic loss, which is unascertainable at this

6  time, and future economic loss, which is presently incalculable.

7                                   **COUNT IV**

8                          **TORTIOUS INTERFERENCE**

9      90.    The allegations of Paragraphs 1 through 60 are incorporated by

10  reference herein with the same force and effect as if set forth in full below.

11      91.    Ameriprise develops and maintains advantageous actual and

12  prospective business relationships and business expectancies with respect to its

13  employees, affiliates, and clients, which promise a continuing probability of future

14  economic benefit to Ameriprise.

15      92.    The business relationships Ameriprise develops and maintains with its

16  employees and affiliates necessitate restrictive covenants including confidentiality

17  obligations.

18      93.    LPL knows about Ameriprise's advantageous actual and prospective

19  business relationships and business expectancies with respect to its employees and

20  affiliates and clients.

21      94.    LPL intentionally interfered with, and continues to interfere with,

22  Ameriprise's business relationships and business expectancies with respect to its

23  employees, affiliates, and clients by, among other things, directly and/or indirectly

24  inducing Ameriprise's employees and affiliates to sever their relationships with

25  Ameriprise and violate their agreements and the Protocol in the process, resulting in

26  a misappropriation of trade secrets to LPL's benefit.

27      95.    There is no privilege or justification for LPL's conduct. On the

28  contrary, LPL is interfering with Ameriprise's business relationships and

Case No. _____
COMPLAINT FOR INJUNCTIVE RELIEF

1  expectancies by improper means.

2       96.    As a direct and proximate result LPL's tortious interference with

3  Ameriprise's actual and prospective business relationships and expectancies,

4  Ameriprise has sustained and will continue to sustain irreparable injury, the

5  damages from which cannot now be calculated and for which there is no adequate

6  remedy at law. Accordingly, Ameriprise is entitled to injunctive relief and damages

7  to be determined at final hearing.

8       **<u>COUNT V</u>**

9       **<u>UNFAIR COMPETITION</u>**

10       97.    The allegations of Paragraphs 1 through 60 are incorporated by

11  reference herein with the same force and effect as if set forth in full below.

12       98.    LPL's conduct as set forth above and incorporated herein is unlawful,

13  unfair and deceptive, and it constitutes unfair competition.

14       99.    LPL is—and always has been—fully aware, or should have been

15  aware, that the misconduct they engaged in would cause Ameriprise to lose clients

16  that it expended great deals of time, effort, and money to develop, whose

17  information LPL would never otherwise obtain, and who LPL would not had an

18  opportunity to advise had LPL not encouraged such egregious violations of the

19  Protocol and relevant agreements and industry standards.

20       100.   LPL's business practices violate federal law and regulations, including

21  but not limited to the DTSA, the Protocol, and various rules and regulations enacted

22  by the SEC and FINRA, for which this Court should issue declaratory and other

23  equitable relief.

24       101.   As a direct and proximate result of LPL's unfair competition,

25  Ameriprise sustained and will continue to sustain irreparable injury, the damages

26  from which cannot now be calculated and for which there is no adequate remedy at

27  law. Accordingly, Ameriprise is entitled to injunctive relief restraining LPL from

28  engaging in further wrongful conduct and restoring the *status quo ante* as well as

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

1  further damages to be decided at final hearing in FINRA.

2  **COUNT VI**

3  **UNJUST ENRICHMENT**

4  102.  The allegations of Paragraphs 1 through 60 are incorporated by

5  reference herein with the same force and effect as if set forth in full below.

6  103.  LPL has been unjustly enriched by their improper access to, retention,

7  use of, and disclosure of Ameriprise's confidential information.

8  104.  LPL has therefore received a benefit to which it is not entitled.

9  105.  That benefit comes at Ameriprise's expense, which LPL knows or has

10  reason to know.

11  106.  LPL's continued retention of those benefits in the form of trade secrets

12  unjustly enriches it, entitling Ameriprise to restitution.

13  107.  LPL condones, encourages, and compensates former Ameriprise

14  advisors for their wrongful conduct as LPL, too, receives substantial profit from and

15  is unjustly enriched by each Ameriprise client whose information they improperly

16  obtain and subsequently solicit.

17  **PRAYER FOR RELIEF**

18  **WHEREFORE**, by virtue of the foregoing acts and conduct complained of in

19  Counts I through VI, Ameriprise respectfully requests entry of a permanent

20  injunction against LPL, and respectfully request that the Court enjoin LPL, directly

21  or indirectly, and whether alone or in concert with others, as follows:

22  Defendant LPL, and all those acting in concert with it, are hereby enjoined

23  and restrained directly or indirectly, from:

24  1.  Acquiring, using, disclosing, or transmitting for any purpose, in any

25  form whatsoever whether hardcopy or electronic or other format, any of

26  Ameriprise's Confidential Information, as defined in the Memorandum

27  of Points and Authorities;

28

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

2.    Deleting, erasing, removing, destroying, or otherwise making unavailable for further proceedings in this matter any of Ameriprise's Confidential Information prior to turning over a complete copy of all such Ameriprise Confidential Information in Defendant's possession, custody, or control.

In furtherance of the above, Ameriprise respectfully requests that this Court further ORDER and DECREE that Defendants:

3.    Identify all electronic devices used by any LPL employee, independent contractor, registered representative, financial advisor, recruit, agent, or affiliate who provided Ameriprise Confidential Information to LPL and engage a third-party forensic analyst to search for and purge all Ameriprise Confidential Information from the employee, independent contractor, registered representative, financial advisor, recruit, agent, and/or affiliate's electronic devices.

4.    Return to Ameriprise any and all of Ameriprise's Confidential Information, including without limitation documents, materials, writings, and data, in any form, whether hardcopy or electronic, which have been removed, electronically downloaded or transferred in any other means from Ameriprise to Defendant;

5.    Identify any current or former Ameriprise employee and/or affiliate with whom LPL discussed a potential, prospective, or actual transition to LPL and to whom LPL provided a "bulk upload spreadsheet" and/or any similar tool, artifice, or device used to obtain or collect information beyond that which is allowable under the Protocol for Broker Recruiting.

And that the Court (1) order the parties to proceed with an arbitration on the merits; and (2) issue any other relief that the Court deems appropriate and proper.

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

Case No. _____

1

2

3  DATED:  July 30, 2024

4

5

6

7

8

9

10

11

12  DATED:  July 30, 2024

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHUMAKER, LOOP & KENDRICK, LLP


By:      /s/ Michael S. Taaffe
_____
Michael S. Taaffe (Pending *Pro Hac Vice*
Admission)
Justin P. Senior (Pending *Pro Hac Vice*
Admission)
James E. Fanto (Pending *Pro Hac Vice*
Admission)
Attorneys for Plaintiff AMERIPRISE
FINANCIAL SERVICES, LLC


KLINEDINST PC


By:      /s/ Greg A. Garbacz
_____
Greg A. Garbacz
Daniel S. Agle
Irean Z. Swan
Attorneys for Plaintiff AMERIPRISE
FINANCIAL SERVICES, LLC

KLINEDINST PC
501 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101

Case No. _____
COMPLAINT FOR INJUNCTIVE RELIEF